IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ANGELA CHANDLER,                           )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )      Civil Action No. 1:17cv1346 (CMH/JFA)
                                           )
NANCY A. BERRYHILL,                        )
*Acting Commissioner, Social Security*     )
*Administration,*                          )
                                           )
                    Defendant.             )
                                           )

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 10, 13). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") that claimant was not disabled as defined by the Social Security Act and applicable regulations.[1]

On May 25, 2018, the parties filed concurrent motions for summary judgment, with the Commissioner filing a motion (Docket no. 10) and memorandum in support (Docket no. 11), and the plaintiff filing a motion (Docket no. 13) and memorandum in support (Docket no. 14). On

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 5). In accordance with these rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

June 8, 2018, the Commissioner filed an opposition to plaintiff's motion.  (Docket no. 16).

Plaintiff did not file an opposition to the Commissioner's motion for summary judgment.  For the

reasons set forth below, the undersigned recommends that the Commissioner's motion for

summary judgment (Docket no. 10) be granted; the plaintiff's motion for summary judgment

(Docket no. 13) be denied; and the Commissioner's final decision be affirmed.

## I.   PROCEDURAL BACKGROUND

Plaintiff applied for DIB on May 9, 2014 with an alleged onset date of March 1, 2014.

(AR 145).  The Social Security Administration denied plaintiff's claims initially on August 11,

2014 (AR 59–65) and on reconsideration on January 16, 2015 (AR 67–75).  After these notices

of denial, on February 11, 2015 plaintiff requested a hearing before the ALJ.  (AR 90).  On April

13, 2016, the Office of Disability and Adjudication Review ("ODAR") notified plaintiff of the

possibility of scheduling plaintiff's hearing by teleconference.  (AR 91–93).  On April 15, 2016,

plaintiff filed an objection to a video teleconference hearing.  (AR 106).  On August 1, 2016,

ODAR notified plaintiff that a hearing was scheduled for September 6, 2016.  (AR 107–134).

On August 11, 2016, Bruce Billman, plaintiff's representative, wrote to the assigned ALJ opting

back into a video teleconference hearing.  (AR 137).

On September 6, 2016, ALJ Melissa Hammock held a video teleconference hearing and

plaintiff appeared with her representative, Bruce Billman.  (AR 33–58).  On December 30, 2016,

the ALJ issued a decision denying plaintiff's claims for disability under the Social Security Act.

(AR 15–32).  In reaching this decision, the ALJ concluded that plaintiff was not disabled under

sections 216(i) and 223(d) of the Social Security Act.  (AR 28).  On February 27, 2017,

plaintiff's representative filed a request for review of the hearing decision.  (AR 144).  On

September 29, 2017, the Appeals Council denied plaintiff's request for review.  (AR 1–6).  As a

result, the decision rendered by the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

On November 27, 2017, plaintiff filed a complaint in the U.S. District Court for the Eastern District of Virginia, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Pursuant to the court's April 25, 2018 Order (Docket no. 9), this case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment (Docket nos. 10, 13).

## II.    STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The duty to resolve conflicts in the evidence rests with the ALJ, not the reviewing court, and the ALJ's decision must be sustained if it is supported by substantial evidence. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### III.   FACTUAL BACKGROUND

**A.   Plaintiff's Age, Education, and Employment History**

Plaintiff was born in 1965 (AR 145) and was 50 years old at the time of the ALJ hearing

on September 6, 2016 (AR 35).  Plaintiff completed high school and attended one year of

college.  (AR 38, 167).  Plaintiff worked as a front office secretary at an elementary school in

Prince William County from September 1995 until December 2013.  (AR 38, 147–50, 157).

Plaintiff stated that she began to experience difficulties with her boss in February 2013 and filed

a grievance in November 2013.  (AR 253, 302).  Starting in December 2013, plaintiff took a long

term leave of absence after her older daughter became extremely ill.  (AR 166).  When plaintiff

attempted to return to her old job, she was asked to interview for the position again, which she

declined to do.  (AR 40).  Plaintiff formally retired from her job as a secretary in October 2015.

(AR 432).

**B.   Summary of Plaintiff's Medical History Prior to Her Alleged Disability Date[2]**

A review of the record indicates that plaintiff does not have a significant relevant medical

history prior to her alleged disability date.  The only noteworthy medical visit occurred on

February 18, 2013, when plaintiff arrived at the office of Dr. Pracrak Siriprakorn complaining of

light-headedness and tremor.  (AR 283).  Plaintiff stated that she began experiencing these

symptoms in the afternoon while she was at work.  (*Id.*).  A review of systems, physical

examination, and EKG all returned normal, but Dr. Siriprakorn noted that plaintiff was "under

lots of stress."  (*Id.*).  Plaintiff underwent a 24-hour Holter monitor and echo-doppler

cardiogram, which were also normal.  (AR 285, 296).

---

[2] The Administrative Record contains approximately 250 pages of medical records from various sources relating to plaintiff's medical treatments.  This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of each and every medical treatment.

C.     **Summary of Plaintiff's Medical History Following Her Alleged Disability Date (March 1, 2014)**

On March 18, 2014, plaintiff appeared for an appointment with Christi Carver, a Clinical Nurse Specialist in Psychiatric Nursing, as part of an outpatient treatment program. (AR 253–55). Ms. Carver observed that plaintiff was experiencing severe anxiety and tension, moderate crying spells, severe excessive worry and apprehension, moderately impaired concentration, moderate insomnia, moderate pessimistic thinking, and severe restlessness. (AR 254). Plaintiff stated that her symptoms stemmed from stress at work and her older daughter's hospitalization and diagnosis with Guillain-Barre Syndrome in December 2013. (AR 253). Ms. Carver found that plaintiff was oriented, alert, neatly dressed and well-groomed, had unimpaired recent and remote memory, good judgment, normal attention/concentration, and a negligible degree of conceptual disorganization. (AR 254).

On March 26, 2014, plaintiff presented at Garrisonville Urgent Care complaining of anxiety stemming from her older daughter's return home. (AR 262). Plaintiff was assessed by the Hamilton Anxiety Rating Scale, which found that she had very severe symptoms of anxious mood, tension, and difficulty in concentration and poor memory; severe symptoms of insomnia; moderate cardiovascular, autonomic, and behavior symptoms; mild symptoms of fear and depressed mood; and no somatic, respiratory, gastrointestinal, or genitourinary symptoms. (AR 263). Plaintiff was diagnosed with anxiety and prescribed antianxiety medication. (AR 262). During a follow-up visit with Ms. Carver on April 1, 2014, plaintiff stated that she was feeling better after starting antianxiety medication. (AR 256). Plaintiff also stated that she was not ready to return to work, and that she had traveled with her family to Maryland to be part of a case presentation on Guillain-Barre Syndrome. (*Id.*). Ms. Carver diagnosed plaintiff with an acute stress reaction and reviewed relaxation techniques and discussed tools for coping. (*Id.*).

5

On April 29, 2014, plaintiff appeared at Embracing Health, Inc. in order to establish care. (AR 267). Plaintiff was examined by Nurse Practitioner Maghan Burge. (AR 269). Plaintiff stated that while she and her older daughter were both doing well, she had moments of anxiety. (AR 267). A review of systems found that plaintiff was experiencing PTSD from her daughter's illness, anxiety, depression, and palpitations with anxious moments, but was otherwise normal. (*Id.*). A physical examination was normal. (AR 268). Ms. Burge diagnosed plaintiff with posttraumatic stress disorder and anxiety and directed her to take supplements to help with sleep. (*Id.*). On May 7, 2014, plaintiff appeared at the Metro Behavioral Health Service Clinic for an initial psychiatric evaluation with Dr. Gebrehana Zebro. (AR 302). Plaintiff stated that her symptoms stemmed from problems at work and her daughter's illness, and that she was depressed, could not sleep, could not let things go, had nightmares and poor sleep, headache, paranoia, depression, and guilt. (*Id.*). Plaintiff further stated that she was very jumpy and hypervigilant, but denied delusions, hallucinations, overt mania, or hypomania. (*Id.*). A psychiatric review of systems found that plaintiff's sleep was poor, appetite was depressed, mood was depressed, affect was mood congruent, and that she had poor memory, concentration, attention, focus, nightmares, and flashbacks. (AR 303). A mental status examination found that plaintiff was well-groomed, cooperative, and had normal speech, thought process, perception, cognitive function, judgment, insight, and impulse control, but was depressed and had nightmares, flashbacks, and obsessions. (*Id.*). Plaintiff was diagnosed with posttraumatic stress disorder and had a GAF score of 51 to 60. (*Id.*). Plaintiff was prescribed Venlafaxine and Prazosin and directed to return in two weeks. (*Id.*).

Plaintiff returned to Embracing Health, Inc. for lab review on May 14, 2014, and a review of systems found anxiety/depression and a recent traumatic event that could lead to

6

PTSD. (AR 270). Plaintiff stated that she did not like the way her recently prescribed medication made her feel. (*Id.*). Plaintiff was prescribed Lexapro and recommended to seek counseling or therapy. (AR 271–72). Plaintiff returned the next day with a reaction to the Lexapro, stating that she had difficulty sleeping and felt "wired." (AR 273). Plaintiff was directed to stop taking Lexapro. (AR 274). On May 27, 2014, plaintiff returned to Metro Behavioral Health Service complaining of poor sleep. (AR 301). Patient was noted to be "at baseline," with a follow-up scheduled to prevent a relapse and continue controlling her symptoms. (*Id.*). On June 17, 2014, plaintiff complained of panic attacks. (AR 300). A mental status examination was normal, and as before, plaintiff was noted to be at baseline with a follow-up scheduled to prevent a relapse and continue controlling her symptoms. (*Id.*). On July 8, 2014, plaintiff complained that she did not feel safe outside her home and felt overwhelmed. (AR 299). A review of symptoms found that plaintiff continued to suffer from panic attacks, and as before, plaintiff was noted to be at baseline with a follow-up scheduled to prevent a relapse and continue controlling her symptoms. (*Id.*). As in the previous visit, plaintiff was accessed as having PTSD and panic disorder. (AR 299, 300).

Starting on July 15, 2014, plaintiff began treatment at Neuropsychology & Complementary Medicine, Inc. ("NaCMed"), an outpatient therapy clinic, for weekly therapy sessions with Dr. Jennifer Newhard, under the supervision of Dr. Melissa Winters, and medication management from Nurse Practitioner Vicky McKay. (AR 353). On July 23, 2014, plaintiff presented complaining of headaches, dizziness, and excessive tiredness. (AR 307). Plaintiff stated that she had difficulty with word finding and reading comprehension, would lose her train of thought and was not very alert or aware, had difficulty planning/organizing or thinking quickly, would forget where things were left and needed hints and reminders while

7

taking care of daily living activities, and had several psychological symptoms, including recurrent and intrusive thoughts, difficulty sleeping, fatigue, nightmares, nervousness, apathy, racing thoughts, and a feeling of worthlessness. (*Id.*). Dr. Winters found that plaintiff may have adult-onset ADHD and directed her to continue receiving outpatient therapy. (*Id.*).

On August 2, 2014, plaintiff returned to Metro Behavioral Health Service, stating that while she was doing fairly well, she still felt upset and overwhelmed, and had not returned to work. (AR 298). A review of symptoms found that plaintiff felt better but still was not motivated, and as before, plaintiff was noted to be at baseline. (*Id.*). On August 6, 2014, plaintiff returned to NaCMed for a follow-up appointment. (AR 309). Dr. Winters found that plaintiff was making progress on self-soothing symptoms of anxiety but continued to exhibit signs of depression. (AR 310). During a follow-up on August 20, 2014, Dr. Winters diagnosed plaintiff with major depressive disorder recurrent episode, generalized anxiety disorder, and unspecified insomnia. (AR 311–12). On September 2, 2014, Dr. Winters found that plaintiff continued to make progress on identifying triggers contributing to insomnia and panic attacks, but continued to exhibit signs of depression. (AR 315).

On September 8, 2014, plaintiff returned to Embracing Health, Inc. for a lab review. (AR 372). Plaintiff stated that she was "doing generally well" and "overall doing much better." (*Id.*). On September 9, 2014, plaintiff returned to NaCMed and expressed worsening symptoms of depression and anxiety. (AR 317). On September 11, 2014, plaintiff had an initial consult with Nurse Practitioner McKay regarding medication management. (AR 328). Ms. McKay prescribed plaintiff Brintellix, Xanax, and Clonidine to take alongside her ongoing therapy sessions. (AR 331). On September 16, 2014, plaintiff returned to Dr. Winters and stated that she had a recent increase in symptoms of anxiety as exhibited through panic attacks and insomnia,

continued to make progress on self-soothing symptoms of anxiety, but continued to exhibit signs

of anxiety and depression. (AR 319–20). Plaintiff stated that she was interested in changing her

medication. (AR 320). On September 23, 2014, Dr. Winters found that plaintiff reported a

decrease in depressive and anxious symptoms over the week prior, attributed to continuing to

reach out to family and friends for empathy. (AR 321). Plaintiff also reported that she was more

willing to increase her social interactions, and reported that processing her frustrations over work

trauma helped decrease her feelings of failure. (*Id.*). However, plaintiff reported continued

issues with her concentration and memory, including during activities of daily living, and a brief

neurocognitive screening suggested that plaintiff had mild to moderate symptoms of ADHD.

(AR 321–22). On September 24, 2014, plaintiff returned to Ms. McKay for a follow-up on her

medication plan, and was prescribed Ambien in addition to Brintellix and was told to discontinue

Clonidine. (AR 338–40). During that visit, Ms. McKay observed that plaintiff had a GAF score

of 58. (AR 339).

On September 30, 2014, plaintiff returned to Embracing Health, Inc. for another lab

review. (AR 375). Plaintiff stated that she was feeling better, but said that she had diminished

memory and occasional panic attacks. (*Id.*). On October 8, 2014, plaintiff returned to NaCMed

for an initial appointment of CBT for depression and anxiety. (AR 324). Plaintiff was found to

be engaged and pleasant, though somewhat dysphoric and teary at times. (*Id.*). Plaintiff was

directed to continue therapy sessions to address her symptoms of anxiety and depression and

their impact on her daily functioning. (*Id.*). On October 10, 2014, plaintiff returned to Ms.

McKay and was prescribed Adderall. (AR 332–34). During that visit, Ms. McKay determined

that plaintiff had a GAF score of 60. (AR 333). On November 10, 2014, plaintiff had an

emergency session with Dr. Newhard to process recent panic attacks, increased insomnia, and

9

increased depressive symptoms. (AR 326). Plaintiff stated that she was experiencing recurring intrusive thoughts pertaining to psychological trauma inflicted the year prior, but was able to formulate a plan to reduce panic attacks. (*Id.*). Plaintiff also reported that while she still had difficulty concentrating during a conversation, her concentration and attention had improved since starting a daily dose of Adderall, and she had no concerns regarding activities of daily living. (*Id.*).

On December 8, 2014, plaintiff had another emergency session with Dr. Newhard, stating that she was increasingly overwhelmed by family stressors. (AR 365). On January 6 and January 23, 2015, plaintiff returned to Dr. Newhard, who found that plaintiff continued to be overwhelmed by family stressors. (AR 361–62). Plaintiff reported that she was struggling to manage feelings of hopelessness, and that the amount of distress caused by her daughter's behavioral issues continued to overwhelm her. (*Id.*). On March 9, 2015, Dr. Newhard stated that plaintiff had been receiving weekly therapy sessions from her since July 15, 2014, and had been diagnosed with major depressive disorder, generalized anxiety disorder, and panic attacks which occurred secondary to situational stressors including work, complex trauma, and family discord. (AR 353). Dr. Newhard also stated that while plaintiff had been able to manage her symptoms through outpatient therapy and medication management, she continued to have severe depressive episodes, panic attacks, and insomnia. (*Id.*). On March 13, 2015, plaintiff contacted Dr. Newhard for a therapy session and stated that she continued to be overwhelmed by family stressors. (AR 360). On April 10, 2015, plaintiff returned to inform Dr. Newhard that she may seek out another therapist due to changes in her insurance and processed her ongoing frustrations with her daughter. (AR 359). It was noted that plaintiff's behavior was consistent with a frustrated parent and that plaintiff did not appear as depressed or anxious as in previous sessions.

10

(*Id.*). On May 25, 2015, plaintiff returned to Embracing Health, Inc. for lab review and reported that she was doing generally well with no major concerns or issues. (AR 380). On June 25, 2015, Dr. Winters provided a letter stating that plaintiff's symptoms continued to interfere with her ability to work, and that plaintiff was requesting an extension of her medical leave of absence. (AR 351). Dr. Winters indicated that she supported plaintiff's request for an extension. (*Id.*).

On August 17, 2015, plaintiff was seen by Tanya Meline, LCSW at Rappahannock Area CSB. (AR 445). Plaintiff stated that she was looking for a new therapist because her current therapist and psychiatrist were no longer taking her insurance. (*Id.*). While plaintiff presented with appropriate hygiene and appropriate behavior and speech, she began crying immediately and continued to cry periodically throughout intake. (*Id.*). Ms. Meline recommended outpatient therapy to address plaintiff's PTSD symptoms. (*Id.*). On August 31, 2015, plaintiff set up a treatment plan and reported some symptom improvement with medication. (AR 443). On September 3, 2015, plaintiff returned to NaCMed where Ms. McKay noted that plaintiff's symptoms of depression were in remission. (AR 346). On September 10, 2015, Dr. Catherine Ward provided plaintiff with a letter stating that NaCMed had been working with the plaintiff intermittently from July 15, 2014 through June 25, 2015, but plaintiff's primary clinicians were no longer employed at NaCMed. (AR 345). Dr. Ward requested that plaintiff not return to work until October 10, 2015 or until NaCMed had an opportunity to conduct testing. (*Id.*). Dr. Ward advised plaintiff that NaCMed was unable to provide continued leave from work absent testing. (*Id.*). On September 14, 2015, plaintiff appeared for a scheduled session with Ms. Meline at Rappahannock Area CSB. (AR 437). Ms. Meline found that plaintiff appeared depressed but was alert and oriented. (*Id.*). Plaintiff stated that she had an ongoing conflict with her younger

11

daughter that caused her depression to worsen over the past week, that she lacked motivation, and she had an increase in crying. (*Id.*).

On September 23, 2015, plaintiff appeared at Mariposa Counseling, Inc. for an evaluation with Janine Rumberger, LCSW, MAC. (AR 492). Ms. Rumberger found that plaintiff's appearance and presentation were neat and appropriate, that her mood was depressed and tearful, that her thought content appeared normal, and her interaction was appropriate. (*Id.*). Her symptoms were noted as depressed, anxious, and irritable. (*Id.*). On October 8, 2015, plaintiff returned for a follow-up session. (AR 491). Ms. Rumberger found that plaintiff appeared as before, but was speaking rapidly and was in an angry mood. (*Id.*). Plaintiff stated that she was contemplating retiring from the school and was feeling numb and resentful towards her old boss. (*Id.*). On October 21, 2015, plaintiff returned for a follow-up appointment with Ms. Rumberger. (AR 490). Ms. Rumberger found that plaintiff's appearance and presentation were neat and appropriate, that her mood was appropriate but tearful, that her thought content appeared normal and her interaction was appropriate. (*Id.*). Ms. Rumberger also found that plaintiff's level of functioning was good at this visit (it having been noted as poor previously), but that she exhibited symptoms of depression and anxiety. (*Id.*).

On October 29, 2015, Rappahannock Area CSB performed a psychiatric assessment and observed that plaintiff was tearful, feeling depressed and guilty, had isolated herself, and had varying concentration. (AR 428–29). Plaintiff also stated that she had excessive worry, muscle tension, experienced an auditory hallucination, and had 4–5 panic attacks per month usually triggered by social situations that last approximately five to ten minutes. (AR 430). A mental status exam was largely normal, but plaintiff was tearful for most of the visit, depressed, and had a dysphoric and constricted affect. (AR 432). The exam also found that plaintiff's thought

content was normal and that she was alert, attentive, oriented to all spheres, and had good insight and judgment. (*Id.*). The exam further found that plaintiff's memory, calculations, fund of information, and abstraction were grossly intact. (AR 433). Plaintiff was prescribed Quetiapine in addition to her current medication and encouraged to continue therapy. (*Id.*). On that same day, plaintiff returned to Ms. Rumberger for a follow-up visit. (AR 489). Ms. Rumberger found that plaintiff's appearance and presentation were neat and appropriate, that her mood was appropriate, that her thought content appeared normal and her interaction was appropriate. (*Id.*). Ms. Rumberger also found that plaintiff exhibited symptoms of depression, anxiety, and anger/irritability. (*Id.*). Plaintiff returned for follow-up appointments on November 5, 2015 and November 9, 2015. (AR 487–88). During her visit on November 5, 2015, plaintiff reported that she was feeling "a little calmer" as a result of her medication. (AR 488).

On November 19, 2015, plaintiff returned for a follow-up appointment with Ms. Rumberger and completed a self-diagnosis questionnaire. (AR 478–86). On December 10, 2015, plaintiff returned and stated that she had a panic attack in a public place the previous week. (AR 472). Her mood was anxious and depressed, and she exhibited symptoms of depression, anxiety, and irritability. (*Id.*). On January 7, 2016, plaintiff returned for a follow-up appointment with Ms. Rumberger. Plaintiff's mood was blunted, anxious, depressed, and fearful, and she exhibited symptoms of depression and anxiety. (AR 473). During follow-up appointments on January 28, February 4, and February 18, 2016, Ms. Rumberger noted few changes. (AR 467–69). On February 18, 2016, plaintiff returned to Rappahannock Area CSB for a progress report. (AR 425). Plaintiff stated that she felt "about the same," and continued to have low mood, frequent crying spells, feelings of guilt, and anxiety. (*Id.*). A mental status exam found that plaintiff was neatly groomed and had good hygiene, teared easily, had a

depressed mood, had various ruminations in her thought content, and was alert, attentive, oriented to all spheres, and had good insight and judgment. (AR 426). Plaintiff was directed to take Trileptal and to consider Luvox to help with obsessive thoughts. (AR 427).

During follow-up visits on March 3, March 10, March 15, March 31, April 7, April 21, and April 28, 2016, plaintiff steadily reported that her symptoms of depression and isolation were worsening, and expressed anxiety regarding her younger daughter. (AR 459–64, 466). On April 14, 2016, plaintiff returned to Rappahannock Area CSB for a progress report. (AR 422). Plaintiff stated that her mood was "about the same," that she achieved good sleep with her medication, but had increased anxiety, and nightmares. (*Id.*). Plaintiff also stated that she was seeing visions related to her daughter being in the hospital, and was concerned about her daughter. (AR 422–23). A mental status exam found that plaintiff was anxious, had various ruminations in her thought content, and was alert, attentive, oriented to all spheres, and had good insight and judgment. (AR 423).

Plaintiff had follow-up appointments with Ms. Rumberger on May 12, May 26, June 2, June 16, June 23, and June 30, 2016 which were largely consistent with her previous visits. (AR 453–58). On June 27, 2016, plaintiff returned to Rappahannock Area CSB for a progress report. (AR 419). Plaintiff stated that while she was doing somewhat better, she felt numb at times and was having some difficulty dealing with her grandmother's death. (*Id.*). Plaintiff stated that she had recently gotten a puppy and felt that it had helped her. (AR 420). During a follow-up appointment with Ms. Rumberger on July 21, 2016, Ms. Rumberger noted that plaintiff's appearance was neat and appropriate, that her mood was depressed, that her thought process and interaction appeared normal, that her level of function was good, and that she exhibited

14

symptoms of depression and anxiety. (AR 452). Plaintiff stated that she was filing for disability.
(*Id.*). Plaintiff also stated that her medications had been somewhat effective. (*Id.*).

### D.    The ALJ's Decision on December 27, 2016

Determining whether an individual is eligible for disability insurance benefits requires
the ALJ to employ a five-step sequential evaluation.  It is this process the court must examine to
determine whether the correct legal standards were applied and whether the ALJ's final decision
is supported by substantial evidence. *See* 20 C.F.R. § 404.1520.  Specifically, the ALJ must
consider whether a plaintiff:  (1) is currently engaged in substantial gainful employment; (2) has
a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in
Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability
to perform her past relevant work; and (5) if unable to return to past relevant work, whether
plaintiff can perform other work that exists in significant numbers in the national economy. *See*
20 C.F.R. § 404.1520.  When considering a claim for DIB, the ALJ must also determine whether
the insured status requirements of sections 261(i) and 223 of the Social Security Act are met.
*See* 42 U.S.C. §§ 416(i), 423.  The regulations promulgated by the Social Security
Administration provide that all relevant evidence will be considered in determining whether a
plaintiff has a disability. *See* 20 C.F.R. § 404.1520(a)(3).

Here, the ALJ made the following findings of fact: (1) plaintiff meets the insured status
requirements of the Social Security Act through June 30, 2019; (2) plaintiff has not engaged in
substantial gainful activity since March 1, 2014, the alleged onset date; (3) plaintiff has the
following severe impairments: posttraumatic stress disorder, major depressive disorder, and
generalized anxiety disorder; (4) plaintiff does not have an impairment or combination of
impairments that meets or medically equals the severity of one of the listed impairments in 20
C.F.R. § 404, Subpart P, Appendix 1; (5) plaintiff has the residual functional capacity to perform

15

a full range of work at all exertional levels but with the following nonexertional limitations: plaintiff is limited to simple, routine tasks, no more than occasional changes in the work setting, occasional interaction with the public, and plaintiff will be off task 10% of the workday; and (6) plaintiff is unable to perform any past relevant work. (AR 20–26). The ALJ then proceeded to step five of the sequential evaluation process: (7) plaintiff was born in 1965 and was 48 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date; (8) plaintiff has at least a high school education and is able to communicate in English; (9) transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not the plaintiff has transferable job skills; and (10) considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (AR 26–27). Finally, the ALJ concluded: (11) plaintiff has not been under a disability, as defined in the Social Security Act, from March 1, 2014, through the date of the ALJ's decision. (AR 27).

## IV. ANALYSIS

### A. Overview

Plaintiff's motion for summary judgment argues that four errors were committed by the ALJ. First, plaintiff contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence. (Docket no. 14 at 7–10). In making this argument, plaintiff asserts that the ALJ failed to establish why restricting her to simple routine tasks, unskilled work, occasional changes in work routine, and occasional contact with the public accounted for her impairments. (Docket no. 14 at 7–8). Plaintiff also argues that the ALJ failed to point to any evidence to support a finding that plaintiff would be off task for 10% of the workday. (Docket no. 14 at 9–10). Second, plaintiff contends that the ALJ applied incorrect standards of law in

evaluating her subjective symptoms and limitations. (Docket no. 14 at 10–13). In making this argument, plaintiff contends that the ALJ improperly found that plaintiff's subjective statements were "not entirely consistent" with the objective evidence in the record rather than determining whether the statements could "reasonably be accepted as consistent" with the objective evidence in the record. (Docket no. 14 at 11). Third, plaintiff contends that substantial evidence does not support the ALJ's conclusion that her allegations of disabling limitations were "generally inconsistent" with the evidence in the record. (Docket no. 14 at 13–17). In making this argument, plaintiff argues that the ALJ's findings regarding her cognitive and emotional functioning, overall stability, conservative treatment, and activities of daily living lacked sufficient rationale. (Docket no. 14 at 13–17). Fourth, plaintiff contends that the ALJ applied incorrect standards of law in finding that she could perform other work. (Docket no. 14 at 17–23). In making this argument, plaintiff argues that the ALJ failed to apply the two-part process discussed in Social Security Ruling 85-15. (Docket no. 14 at 18–19).

**B.      Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Residual Functional Capacity**

Residual functional capacity is "the most [a plaintiff] can still do despite [his or her] limitations" and is to be assessed "based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). If the first three steps of the sequential disability evaluation do not lead to a disability determination, the ALJ must determine an individual's residual functional capacity and apply it to steps four and five. *Mascio*, 780 F.3d at 635. Here, the ALJ found that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels subject to nonexertional limitations: the plaintiff is limited to simple, routine tasks; no more than occasional changes in the work setting; and, occasional interaction with the public. (AR 23–26). The ALJ also noted that plaintiff will be off task 10% of the workday. (*Id.*).

17

As an initial matter, the ALJ's assessment properly applied the principles set forth in *Mascio*. In *Mascio*, the Fourth Circuit "agree[d] with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio*, 780 F.3d at 638 (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The court also found that "the ability to perform simple tasks differs from the ability to stay on task," with "the latter limitation [] account[ing] for a claimant's limitation in concentration, persistence, or pace." *Id.* The ALJ in *Mascio* failed to explain why the claimant's moderate limitation in concentration, persistence, or pace did not translate into a limitation on the claimant's residual functional capacity, instead relying on the vocational expert's unsolicited addition of "unskilled work" to account for potential mental limitations. *Id.* at 637–38.

District courts in the Fourth Circuit have held that an ALJ satisfies the requirements in *Mascio* by providing a detailed discussion of a claimant's capacity for concentration, persistence, or pace and taking any limitations into account in the residual functional capacity assessment, as the ALJ did in this case. *See Thomas v. Colvin*, 2016 WL 1070826, at *4 (E.D. Va. Mar. 16, 2016) (collecting cases). In this case, the ALJ's residual functional capacity assessment included several nonexertional restrictions designed to accommodate plaintiff's mental impairments. These restrictions included that plaintiff was limited to simple, routine tasks; no more than occasional changes in the work setting; occasional interaction with the public; and a recognition that plaintiff would be off task 10% of the workday. (AR 23). Moreover, the ALJ provided sufficient justification for finding that plaintiff's mental impairments resulted in only those restrictions. (AR 23–26). The ALJ specifically found that the majority of the evidence in the record indicated that plaintiff maintained grossly intact cognitive and emotional functioning

18

during the relevant period while receiving only routine and conservative medication management and outpatient therapy, that plaintiff reported overall stability throughout the relevant period with notations of improved symptoms in late 2014 and mid-June 2016, and plaintiff was, for the most part, capable of performing various activities of daily living. (AR 21, 25–26). In this case the ALJ recognized plaintiff's severe impairments of posttraumatic stress disorder, major depressive disorder, and generalized anxiety disorder. (AR 20–26). The ALJ then performed a detailed review of the plaintiff's medical records, weighing the conflicting statements in those records relating to plaintiff's limitations, and she made certain credibility determinations in making her assessment of plaintiff's residual functional capacity. (*Id.*). The weighing of the conflicting evidence in the medical records and credibility determinations are for the ALJ, not this court, as long as they are supported by substantial evidence. In this case the ALJ did provide the basis for her determinations in the analysis of plaintiff's medical records. Accordingly, as discussed further below, the undersigned recommends a finding that the ALJ's discussion and analysis of plaintiff's mental impairments satisfies the standard set forth in *Mascio* and that substantial evidence supports the ALJ's assessment of plaintiff's residual functional capacity.

     *1.*     *Substantial Evidence Supports the ALJ's Finding that Plaintiff Can Still Perform a Job that Exists in Significant Numbers in the National Economy*

Plaintiff first argues that the ALJ's decision fails to comply with the standards set forth in *Mascio* on the grounds that the ALJ "never explained how successful or accurate [plaintiff] would have been in meeting qualitative standards of productivity once she began to undertake those simple, routine tasks—especially given a 'moderate' impairment to concentration." (Docket no. 14 at 8). The Commissioner argues in response that the ALJ's decision complies with *Mascio* by properly establishing a residual functional capacity that accommodated plaintiff's actual limitations. (Docket no. 16 at 3–5). In determining whether a claimant can

19

perform other work, the Commissioner bears the burden of "providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c)(2). In making its case, the Commissioner "typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Mascio*, 780 F.3d at 635.

In this case, the ALJ elicited testimony from a vocational expert responding to a hypothetical incorporating her residual functional capacity assessment. (AR 27, 56–57). The vocational expert identified three representative occupations, including (1) laundry laborer, medium and unskilled work, of which there are 50,000 such jobs in the national economy; (2) classifier, light and unskilled work, of which there are 60,000 such jobs in the national economy; and (3) administrative support, sedentary and unskilled work, of which there are 14,000 such jobs in the national economy. (AR 27, 56). The ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. (AR 27). Plaintiff does not dispute the vocational expert's testimony, but instead seeks to impose an additional burden on the ALJ by arguing that the ALJ should have explained how successful plaintiff would have been in meeting qualitative standards of productivity. Tellingly, plaintiff has not cited to any authority for this proposition and the undersigned is not aware of any requirement that after accepting a vocational expert's testimony concerning representative jobs in the national economy that a person with a stated residual functional capacity could perform, an ALJ must then specifically address how the plaintiff would be able to perform those jobs. Accordingly, the undersigned recommends a finding that the vocational expert's testimony provides substantial evidence that, assuming the accuracy of the ALJ's residual functional

capacity assessment, plaintiff is able to perform a job that exists in significant numbers in the national economy.

2.    *The ALJ's Residual Functional Capacity Assessment is an Expression of the Most Plaintiff Can Do*

Next, plaintiff disputes the ALJ's assessment on the grounds that it is not an expression of the most she can do. (Docket no. 14 at 8–9). Specifically, plaintiff notes that the ALJ made the following statement: "I give little weight to [the State agency consultants] in this decision. . . . [Plaintiff's] extended history persuasively establishes the presence of *at least moderate level* of limitations in social functioning and concentration." (AR 22–23 (emphasis added)). However, in finding that the plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, the ALJ discussed plaintiff's impairments and found that plaintiff has "moderate difficulties" in the area of "concentration, persistence, or pace." (AR 21–22). Plaintiff argues that the ALJ's finding of "at least" moderate limitations suggests that the ALJ's assessment fails to express the most plaintiff can do, as required by 20 C.F.R. § 404.1545(a)(1). (Docket no. 14 at 9).

Plaintiff's argument ignores the context of the ALJ's statements. The statement regarding "at least moderate limitations" makes clear that the ALJ was drawing a contrast between the evidence in the record and the State agency physicians' findings that plaintiff had "minimal psychological limitations."  (AR 22–23). On the other hand, the ALJ's residual functional capacity assessment was that plaintiff had "moderate difficulties" in the area of "concentration, persistence, or pace." (AR 23). Plaintiff seeks to improperly conflate the two statements to create an inconsistency where none exists.  Accordingly, the undersigned

21

recommends a finding that the ALJ's residual functional capacity assessment is an expression of the most the plaintiff can do.

### 3. Substantial Evidence Supports the ALJ's Finding that Plaintiff Will be Off Task 10% of the Workday

Plaintiff also contends that the ALJ failed to adequately explain her finding that plaintiff will be off task 10% of the time. (Docket no. 14 at 9–10). Plaintiff argues that this percentage is critical given that the vocational expert testified that if plaintiff was found to be off task 15% of the time, she would be precluded from maintaining employment. (AR 57). The vocational expert clarified that "off task" could refer to either absenteeism or loss of efficiency. (*Id.*). The Commissioner argues that the ALJ's finding that plaintiff will be off task for 10% of a workday is supported by substantial evidence, and plaintiff has provided no record evidence indicating that she will be off task for 15% of the workday rather than 10%. (Docket no. 16 at 8–9). In making a residual functional capacity assessment, the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (citing *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

In this case, the ALJ made her residual functional capacity assessment and proceeded to explain how she arrived at that assessment. (AR 23–26). The ALJ first determined plaintiff's underlying physical or mental impairments that could reasonably be expected to produce plaintiff's symptoms and then evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limit plaintiff's functioning. (*Id.*). With respect to the intensity, persistence, and limiting effects of plaintiff's symptoms, the ALJ determined that plaintiff's subjective statements were not entirely consistent with the objective evidence in the

record and proceeded to explain how specific objective evidence undermined plaintiff's subjective statements. (AR 24–26). Having discussed the evidence in the record, the ALJ arrived at her residual functional capacity assessment; including the limitation that plaintiff will be off task up to 10% of the workday. (AR 26).

The vocational expert's testimony supports the conclusion that being off task for 10% of the workday rather than 15% of the workday is critical to the ALJ's disability determination. However, the ALJ provided adequate justification for her residual functional capacity assessment and substantial evidence supports that assessment. In arguing that the ALJ should have affirmatively distinguished between being off task for 10% of the workday rather than 15%, plaintiff argues that the ALJ should have provided something more than an "accurate and logical bridge" from the evidence to her conclusion. Rather, plaintiff bears the burden of arguing that the substantial evidence supports a higher off task percentage, which she has not attempted to do. *See Stevens v. Comm'r Soc. Sec. Admin.*, 2015 WL 1822796, at *2 (D. Md. Apr. 21, 2015). Instead, plaintiff rests her case on her own testimony that she would plan to do something away from the home but would find she could not emotionally cope "at least once or twice a week at least," but that evidence on its own does not meaningfully rebut the ALJ's finding. (Docket no. 14 at 10 n.2 (citing AR 49–50)). Accordingly, the undersigned recommends a finding that substantial evidence supports the ALJ's residual functional capacity assessment.

**C.      The ALJ's Credibility Determination is Supported by Substantial Evidence**

Plaintiff's second challenge to the ALJ's decision relates to her determination that plaintiff's subjective statements are "not entirely consistent" with the evidence in the record. (Docket no. 14 at 10–13). Plaintiff argues that the ALJ applied an inappropriately heightened standard in evaluating her statements. (Docket no. 14 at 11–12). The Commissioner argues that the ALJ's determination applied the correct standards of law, considered all relevant evidence in

the record, and arrived at a credibility determination that is supported by the record. (Docket no. 16 at 10–12). In assessing subjective complaints, an ALJ must follow a two-step process: (1) "[t]here must be objective medical evidence from an acceptable medical source that shows you have medical impairment(s) which . . . when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled"; and (2) "after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, [] the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." 20 C.F.R. § 404.1529(a) & (c); *see Craig*, 76 F.3d at 594–95. Moreover, in making credibility determinations, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" that the claimant's testimony was not credible "such that it will allow meaningful review of his decision." *Monroe*, 826 F.3d at 189 (citing *Clifford*, 227 F.3d at 872 (7th Cir. 2000)).

In making her argument, plaintiff cites to 20 C.F.R. § 404.1529, which states:

> We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence *and the extent to which there are any conflicts* between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your medical sources or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can *reasonably be accepted as consistent* with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4) (emphasis added). Plaintiff argues that pursuant to this regulation, the ALJ is required to not only identify inconsistencies between plaintiff's subjective statements and the objective record, but that the ALJ must also determine the "extent" to which conflicts may exist and whether plaintiff's statements are nevertheless "reasonably consistent" with the evidence as a whole. (Docket no. 14 at 12). Plaintiff also argues that the ALJ must consider all evidence in the record, including evidence that would militate in favor of the plaintiff and explain why that evidence was nevertheless outweighed by the evidence relied upon to deny the claim. (Docket no. 14 at 12).

Plaintiff's argument is premised on a mischaracterization of the ALJ's decision as requiring a "perfect" case that plaintiff must meet. A review of the ALJ's decision finds that the ALJ followed the two-step process articulated by the regulations in demonstrating that the objective evidence in the record consistently undermined the plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of her symptoms. (AR 24–25). The ALJ also explained her reasoning for discounting evidence favorable to plaintiff, including two letters in the record from mental health professionals recommending that plaintiff be given time off work during 2015, finding that they failed to propose any specific restrictions on plaintiff's mental capacity. (AR 25). In addition to the medical evidence in the record, the ALJ discussed plaintiff's Function Report, representative briefs submitted on her behalf, third party witness statements, and plaintiff's statements during medical examinations regarding activities of daily living in determining that plaintiff's subjective statements were outweighed by the evidence in the record. (AR 25–26). Indeed, plaintiff has not identified evidence in the record that materially challenges the ALJ's determination, and a review of the record indicates that

substantial evidence supports the ALJ's decision. Accordingly, the undersigned recommends a finding that the ALJ's credibility determination is supported by substantial evidence.

### D.   Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Allegations of Disabling Limitations

Plaintiff's third challenge to the ALJ's decision relates to her determination that plaintiff's allegations regarding her disabling limitations were generally inconsistent with the evidence in the record. (Docket no. 14 at 13–17). In particular, plaintiff argues that substantial evidence does not support the four factors the ALJ identified in support of this finding: (1) plaintiff maintained grossly intact cognitive and emotional functioning during the relevant period with the benefit of no more than routine and conservative medication management and outpatient therapy; (2) plaintiff reported overall stability throughout 2014–2016 and admitted to notably improved symptoms in late 2014 and mid-June 2016; (3) plaintiff's treating physicians neither recommended nor prescribed more aggressive treatment modalities such as inpatient therapy; and (4) plaintiff's activities of daily living persuasively indicate that she retains greater functional capacity than alleged insofar as she is capable of caring for her personal hygiene, performing various household chores, preparing meals, driving, and getting along with others, among other things. (AR 25–26). The Commissioner argues that the ALJ's credibility determination was well-supported by the record, and that the credibility determination is entitled to great deference. (Docket no. 16 at 12–16). In reviewing an ALJ's decision, the courts "do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)).

A review of the decision and the evidence reveals that the ALJ's credibility determination is supported by substantial evidence and plaintiff has failed to materially dispute the ALJ's analysis of the evidence in the record. Plaintiff contends that the ALJ's argument for the first factor relies on a misinterpretation of the record. (Docket no. 14 at 13–14). In particular, plaintiff takes issue with the ALJ's reliance on plaintiff's "normal" appearance during mental status examinations, arguing that those examinations were not representative of her functioning in the workplace. (Docket no. 14 at 13–14). However, the ALJ provided an adequate record to support her decision that plaintiff maintained grossly intact cognitive and emotional function during the relevant period. On March 18, 2014, during the first medical appointment in the record following her alleged disability date, plaintiff presented for an initial psychiatric diagnostic interview complaining of panic, depression, memory disturbances, and stress, but was also found to exhibit normal cognitive and emotional functioning. (AR 24, 253–55). The ALJ found that plaintiff's subsequent medical history showed that she continued to exhibit grossly intact cognitive and emotional functioning throughout 2014–16, including during her regular therapy appointments (AR 307–71, 419–95) and during physical examinations conducted by non-treating physicians (AR 372–418). (AR 24–25). The ALJ considered contrary evidence, specifically noting that plaintiff suffered an auditory hallucination in October 2015, but found that plaintiff did not exhibit a substantial change in her psychological condition despite this incident. (AR 25, 430). Similarly, the ALJ explained that two letters written by mental health professionals in June and September 2015 recommending that plaintiff be given leave from work failed to propose specific restrictions based on plaintiff's mental capacity. (AR 25, 345, 351). Indeed, the latter of the two letters stated that NaCMed advised plaintiff that they would be unable to provide plaintiff with leave from work absent testing. (AR 345). Plaintiff points to

pieces of evidence to rebut the ALJ's credibility determination, including plaintiff appearing with "some tearfulness" and "some psychomotor aberrations and depressed mood," but fails to account for the bulk of the evidence supporting the ALJ's determination. (Docket no. 14 at 14).

With respect to the second factor, plaintiff argues the ALJ's characterization of her condition as "stable" was at odds with a medical record suggesting that plaintiff's symptoms waxed and waned. (Docket no. 14 at 14–15). Plaintiff also argues that "stability" does not mean that the resulting behavior is normal, but rather that it is consistent. (Docket no. 14 at 14). However, as with the first factor, the ALJ's decision provides adequate analysis and is supported by substantial evidence. The ALJ's review of the record demonstrated that while plaintiff had ongoing anxiety and depressive feelings throughout the relevant period, she was consistently found to be in normal cognitive and emotional condition, and had no substantial changes to her psychological condition as of February 2016 that required anything more than routine and conservative medication management and outpatient therapy. (AR 25, 419–45, 452–95). Plaintiff has not challenged the ALJ's characterization of her stability aside from arguing that stability is relative and must be viewed in context; the ALJ's decision does just that. (Docket no. 14 at 14).

With respect to the third factor, plaintiff argues that the ALJ was improperly "playing doctor" in finding plaintiff's allegations inconsistent with the evidence in the record because plaintiff's treating physicians did not recommend more aggressive treatment. (Docket no. 14 at 15). As an initial matter, the ALJ is permitted to consider "[t]he type, dosage, effectiveness, and side effects of any medication" taken by plaintiffs to alleviate her symptoms, as well as "[t]reatment, other than medication," received to relieve her symptoms in evaluating plaintiff's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)–(v). Moreover, rather than meaningfully contesting

this characterization of her treatment, plaintiff simply states that the ALJ's characterization was improper. (Docket no. 14 at 15). However, the evidence in the record supports the ALJ's conclusion that plaintiff's treatment consisted of "conservative medication management and outpatient therapy." (AR 21).

With respect to the fourth factor, plaintiff argues that the ALJ failed to explain how plaintiff's daily activities indicate that she retains a greater functional capacity than alleged. (Docket no. 14 at 16–17). Plaintiff argues that the ALJ should have specifically discussed which work-related activities plaintiff could perform as evidenced by her daily activities. (Docket no. 14 at 16). As an initial matter, the ALJ is permitted to consider "daily activities" in evaluating plaintiff's symptoms. 20 C.F.R. § 404.1529(c)(3)(i). The ALJ provided adequate analysis for her decision that plaintiff's activities in daily living indicate that she retains a greater functional capacity than alleged. (AR 25). For example, in her Function Report dated July 14, 2014, plaintiff indicated she had no problems with personal care, prepared her own meals daily, was capable of completing household chores throughout the week, drove to complete chores, and could follow a range of simple instructions. (AR 21, 178–82). Plaintiff's testimony during the September 6, 2016 hearing corroborated the statements in her Function Report. (AR 41–50).

The primary case plaintiff relies upon in making her argument, *Woods v. Berryhill*, discusses materially different circumstances. In that case, the court found that the ALJ erred by only considering the type of daily activities the claimant could perform without considering the extent to which she could perform them. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). Specifically, the court found that while the ALJ found that the claimant could "maintain her personal hygiene, cook, perform light household chores, shop, socialize with family members, and attend church services on a regular basis," the ALJ neglected to consider the claimant's

statements that she could not "button her clothes, has trouble drying herself after bathing, and sometimes needs help holding a hairdryer," that other tasks took longer than normal, and that sometimes she would spend the entire day on the couch due to severe pain in her hands. *Id.* at 694–95 (internal quotation marks omitted). In this case, the ALJ considered the extent to which plaintiff could perform daily activities, including evidence supporting plaintiff's allegations, noting that she had testified to "irritability and an anxiety state," as well as an "increase in social paranoia and isolation," and concluded that plaintiff had "moderate difficulties" in the area of social functioning. (AR 22). Thus, the ALJ considered the totality of plaintiff's ability to perform daily activities and rendered a decision adhering to the framework articulated in *Woods*. Accordingly, the undersigned recommends a finding that the ALJ's credibility determination regarding plaintiff's allegations of disabling limitations is supported by substantial evidence.

### E. The ALJ's Finding that Plaintiff can Perform Other Work is Supported by Substantial Evidence

Plaintiff's final challenge to the ALJ's decision relates to the ALJ's finding that plaintiff can perform other work when considering her age, education, work experience, and residual functional capacity. (Docket no. 14 at 17–23). Plaintiff argues that the ALJ applied an incorrect legal standard rather than the standard required by SSR 85-15 and *Bisceglia v. Colvin*, 173 F. Supp. 3d 326 (E.D. Va. 2016). The Commissioner argues that plaintiff's interpretation of the legal standard is incorrect and that the ALJ's analysis complies with SSR 85-15 and the *Bisceglia* decision. (Docket no. 16 at 16–21).

When an ALJ determines at step four that a claimant cannot perform any past relevant work, the ALJ must determine at step five whether the claimant can perform other jobs existing in significant numbers in the national economy. *Mascio*, 780 F.3d at 635; 20 C.F.R. § 416.920(a)(4)(v). In determining whether other work exists, the Commissioner may employ the

Medical-Vocational Guidelines, which contain three tables or "Grids" that take administrative notice of the numbers of jobs existing in the national economy for persons by considering an individual's age, education, previous work experience, and residual functional capacity. *Grant v. Schweiker*, 699 F.2d 189, 191–92 (4th Cir. 1983); 20 C.F.R. § 404, Subpt. P, App. 2. Table No. 1 concerns claimants with a residual functional capacity limited to sedentary work as a result of severe medically determinable impairment(s), Table No. 2 concerns claimants with a residual functional capacity limited to light work, and Table No. 3 concerns claimants with a residual functional capacity limited to medium work. 20 C.F.R. § 404, Subpt. P, App. 2. Each table contains columns for various age categories, educational abilities, and previous work experience. *Id.* For the various permutations of these factors, the tables or grids dictate a finding of either "disabled" or "not disabled" and each such finding is given a "Rule" designation. *Id.*

When a claimant is found to have impairments that result in solely exertional limitations,[3] the ALJ may rely exclusive on the Grids to assess the claimant's disability. 20 C.F.R. § 404.1569a(b). However, when a claimant is found to have impairments that result solely in non-exertional limitations,[4] the Grids do not direct conclusions of disabled or not disabled. SSR 85-15, 1985 WL 56857, at *1. In the case where "a claimant's nonexertional impairments limit the range of jobs available to a person with the claimant's exertional capabilities, [] the Commissioner must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy." *Simpson v. Colvin*, 2014 WL 806121, at *2 (E.D. Va. Feb. 28, 2014) (quoting *Grant*, 699 F.2d at 192); *see* 20 C.F.R. § 404, Subpt. P, App. 2, 204.00.

---

[3] "Exertional limitations" are defined as those which affect the ability to meet strength demands of jobs, including sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 404.1569a(b).

[4] "Nonexertional limitations" are defined as those which affect the ability to meet the demands of jobs other than the strength demands, including anxiety, depression, difficulty concentrating, and difficulty understanding or remembering detailed instructions. 20 C.F.R. § 404.1569a(c).

Plaintiff contends that the ALJ erred by failing to follow SSR 85-15, which provides a

framework for decisions concerning persons who have only nonexertional limitations. (Docket

no. 14 at 19). SSR 85-15 provides the following guidance:

> Given no medically determinable impairment which limits
> exertion, the first issue is how much the person's occupational
> base—the entire exertional span from sedentary work through
> heavy (or very heavy) work—is reduced by the effects of the
> nonexertional impairment(s). This may range from very little to
> very much, depending on the nature and extent of the
> impairment(s). In many cases, a decisionmaker will need to
> consult a vocational resource.
>
> . . .
>
> The second issue is whether the person can be expected to make a
> vocational adjustment considering the interaction of his or her
> remaining occupational base with his or her age, education, and
> work experience. A decisionmaker must consider sections
> 404.1562-404.1568 and 416.962-416.968 of the regulations,
> section 204.00 of Appendix 2, and the table rules for specific case
> situations in Appendix 2. If, despite the nonexertional
> impairment(s), an individual has a large potential occupational
> base, he or she would ordinarily not be found disabled in the
> absence of extreme adversities in age, education, and work
> experience.

SSR 85-15, 1985 WL 56857, at *3 (S.S.A. Jan. 1, 1985). Plaintiff argues that the guidance in

SSR 85-15 requires the ALJ to specifically ask the vocational expert how plaintiff's occupational

base is reduced by the effects of her nonexertional impairments. (Docket no. 14 at 19). As

explained in detail below, plaintiff's argument is unpersuasive.

During the September 6, 2016 hearing, the ALJ posed the following question to the

vocational expert: "For the following hypothetical question, assume an individual with the same

age, education, and work experience as the claimant, further assume this individual has no

exertional limitations, but is limited to simple, routine tasks with no more than occasional

changes in work setting; occasional interaction with the public; and off task 10%; past work is

32

excluded? . . . And are there other jobs in the national economy?" (AR 56). The vocational expert testified that past work was excluded and then provided examples of alternative work. (*Id.*). The ALJ characterized this interaction in her decision as follows: "To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (AR 27). In doing so, the ALJ complied with the framework articulated by SSR 85-15 by determining that plaintiff's nonexertional limitations reduced plaintiff's occupational base such that she could no longer participate in past work, and elicited testimony determining which occupations existed based on plaintiff's remaining occupational base. (AR 27). The ALJ, citing to SSR 85-15 and 20 C.F.R. § 404, Subpart P, Appendix 2, 204.00, indicated that she used the Grids as a framework in making her decision. (AR 27). Plaintiff's argument that the ALJ failed to consider the occupational base because she "never uttered" the phrase "occupational base" and failed to ask the vocational expert about a reduction to her occupational base is not borne out by the record. (Docket no. 14 at 20). Indeed, the ALJ's line of questioning and decision were predicated on the principles provided by the regulations in finding that plaintiff's occupational base was modified by non-exertional limits, and then considering the Grids as part of her assessment regarding plaintiff's ability to perform specific jobs which exist in the national economy. (AR 26–27, 56–57).

Plaintiff also argues that a recent decision from a court in this district, *Bisceglia v. Colvin*, further demonstrates that the ALJ failed to conduct a proper vocational analysis. (Docket no. 14 at 22–23). In *Bisceglia*, the court remanded the final decision of the Commissioner denying DIB and supplemental security income on the grounds that the ALJ erred in explaining his residual

functional capacity assessment. *Bisceglia*, 173 F. Supp. 3d at 336. In particular, the court found that the ALJ: (1) failed to reconcile the discrepancy between his residual functional capacity assessment and the opinions of State agency medical consultants and (2) failed to sufficiently explain the basis of his decision to apply the Grid Rules for light work. *Id.* at 331–36. In his residual functional capacity assessment, the ALJ found that the claimant could perform "light work" but cited to and strongly relied upon the State agency medical consultants' finding that the plaintiff "demonstrated the maximum sustained work capability for sedentary work." *Id.* at 331–32 (internal quotation marks omitted). The court found that the ALJ's decision conflicted with the evidence he relied upon, and found that the ALJ failed to adequately explain how he arrived at his residual functional capacity assessment in light of the contrary evidence. *Id.* at 333–34.

After rendering his assessment, the ALJ in *Bisceglia* applied the Grid Rules for light work in determining that the claimant was not disabled. *Id.* at 334. Because the claimant was found to have nonexertional limitations as well as exertional limitations, the ALJ was required to consider the extent to which the claimant's work capability was diminished by those nonexertional limitations and then prove through vocational expert testimony that jobs existed in the national economy that the claimant could perform. *Id.* (citing *Aistrop v. Barnhard*, 36 F. App'x 145, 147 (4th Cir. 2002)). The ALJ consulted the vocational expert after determining that the claimant's "ability to perform all or substantially all of the requirements of light work ha[d] been impeded by additional limitations," but then failed to mention the Grid Rules for sedentary work in his decision. *Id.* at 335. The court found that the ALJ's failure to explain why he choose to use the Grid rules for light work over the rules for sedentary work left an irreconcilable gap in his decision and remanded the decision for further proceedings. *Id.* at 335–36.

The facts in *Bisceglia* are materially different than the facts in this case.  Here, the ALJ provided adequate justification for her residual functional capacity assessment, that assessment is supported by substantial evidence, and her analysis at step five incorporated the nonexertional limitations she found in her assessment.  In incorporating the limitations found in the ALJ's assessment, the vocational expert found that plaintiff would be able to perform the requirements of medium and unskilled work.  (AR 56).  The vocational expert also explained that while the limitation of being off task at 10% was not described in the Dictionary of Occupational Titles, it was incorporated in his analysis based on his 25 years of experience.  (AR 56–57).  The ALJ's decision properly relied on the vocational expert's testimony, and unlike in *Bisceglia*, the ALJ's analysis of nonexertional limitations is adequate and supported by the substantial evidence.  (AR 26–27).  Accordingly, the undersigned recommends a finding that the ALJ's assessment that plaintiff can perform other work is supported by substantial evidence.

## V.   CONCLUSION

Based on the foregoing, it is recommended that the court finds that the Commissioner's final decision, denying benefits for the period of March 1, 2014 through the date of the decision, is supported by substantial evidence and that the proper legal standards were applied in evaluating the evidence.  Accordingly, the undersigned recommends that the Commissioner's motion for summary judgment (Docket no. 10) be granted; the plaintiff's motion for summary judgment (Docket no. 13) be denied; and the final decision of the Commissioner be affirmed.

## NOTICE

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 26 day of July, 2018.

/s/

John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

36